Tagged
**ORDERED in the Southern District of Florida on** 09/04/09.



Raymond B. Ray, Judge
United States Bankruptcy Court

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA**
www.flsb.uscourts.gov
Broward Division

In re:                                                                  Case No. 08-25185-BKC-RBR

SFD @ HOLLYWOOD, LLC,                                 Chapter 11
a Florida limited liability company,

      Debtor and Debtor-in-Possession.
_____/

## MEMORANDUM DECISION OVERRULING DEBTOR'S OBJECTION AND AMENDED OBJECTION TO CLAIM NO. 4-1

This matter came before the Court for trial from July 13 to July 17, 2009, upon the Objection to Claim No. 4-1 of VCI Building, LLC (the "Objection") [D.E. 73] and Amended Objection to Claim No. 4-1 of VCI Building, LLC (the "Amended Objection") [D.E. 106], filed by Debtor SFD @ Hollywood, LLC ("SFD" or the "Debtor"), and the joinder thereto [D.E. 119], filed by Intervenor Abele Realty Group, LLC.

The Court heard five (5) days of testimony and admitted over 130 exhibits into evidence. The Debtor presented the testimony of three (3) fact witnesses and four (4) expert witnesses: Charles Abele ("Abele"), a managing member of SFD; Yosef Yosifove ("Yosifove"), the principal of VCI Building, LLC ("VCI" or the "Claimant"); James Edwards ("Edwards"), a former Executive Director of the City of Hollywood Community Redevelopment Agency ("CRA"); Walter Duke ("Duke"), an MAI appraiser; James Fried ("Fried"), a real estate broker; Robert Love ("Love"), an

MAI appraiser; and Richard Zimmer ("Zimmer"), a construction estimator/engineer. VCI presented three (3) fact witnesses and one (1) expert witness: Yosifove; Abele; Ricardo Fraga ("Fraga"), former counsel for the Debtor; and Michael Cannon ("Cannon"), an MAI appraiser. The Court has also considered the legal memoranda submitted by the Debtor and VCI.

Based upon its consideration of the above, the Court enters this Memorandum Decision overruling the Objection and Amended Objection.

### FINDINGS OF FACT & CONCLUSIONS OF LAW

#### I. Burden of Proof

Rule 3001(f) of the Federal Rules of Bankruptcy Procedure provides, "A proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim." Under this rule, as well as 11 U.S.C. § 502(a), which states that claims[1] are allowed unless a party in interest objects, the burden "shifts to the objector to produce evidence sufficient to negate the *prima facie* validity of the filed claim." *In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173 (3d Cir. 1992). The objector must produce evidence that, if believed, would refute at least one of the allegations essential to the claim's legal sufficiency. *In re Allegheny Int'l, Inc.*, 954 F.2d at 173-74. If the objector succeeds, the burden reverts to the claimant to prove the validity of the claim by a preponderance of the evidence. *In re Allegheny Int'l, Inc.*, 954 F.2d at 174.

In this case, VCI asserts that it holds a $6 million claim arising from the liquidated damages provision of a contract that it executed with the Debtor. The Debtor argues that it was excused from timely performance and that the liquidated damages provision is unenforceable as a penalty. The Debtor has the initial burden of producing evidence sufficient to negate the *prima facie* validity of VCI's claim. See *In re Allegheny Int'l, Inc.*, 954 F.2d at 173.

#### II. Background

---

[1] Proof of which is filed under 11 U.S.C. § 501.

A. **Formation of Contract, Amendment to Contract, and Option Agreement**

On or about February 27, 2002, SFD and VCI entered into a Letter of Intent (the "LOI") for the purchase and sale of Lots 2 through 14 of Block 40 (the "Property") in Hollywood, Florida. The Property fronts Young's Circle and lies between Harrison Street and Hollywood Boulevard on the western side of Young's Circle. The Property is the site of the Great Southern Hotel (the "Hotel"), which was closed before VCI obtained title to the Property in 1999.

The LOI reflects a sale price of $2.7 million for the Property, at which the Debtor intended to build a mixed-use condominium project with ground floor retail space (the "Retail Space"). The parties also agreed that VCI would have the option to buy back the Retail Space, anticipated at that time to be 30,000 square feet, for $65/ft$^2$ of hard costs and $5/ft$^2$ of soft costs (the "Option").

After executing the LOI, the parties commenced negotiations over a formal contract for the purchase and sale of the Property (the "Contract"). Each side was represented by counsel—the Debtor by Ricardo Fraga of Greenberg Traurig, LLP and the Claimant by Jonathan Beloff ("Beloff") of Beloff & Schwartz, P.A. The evidence presented at trial reflected that at least six (6) drafts of the Contract were circulated among the parties. The Option contained in the various drafts was heavily negotiated and revised as follows: (i) the size of the Retail Space was reduced from 30,000 to 25,000 square feet; (ii) additional costs were added for certain elevator and HVAC service to the Retail Space; (iii) the Debtor was given the ability to buy back the Option at its election; (iv) VCI was provided a credit against the purchase price under the Option in the event that the Debtor failed to deliver less than 25,000 but more than 20,000 square feet of the Retail Space; (v) the term of the Option was modified; (vi) the time within which the Debtor was required to deliver a Certificate of Completion ("COC") for the Retail Space was modified; (vii) the effect of and the remedies for the parties not agreeing to the additional costs related to HVAC, elevators, utilities, etc. was included; and (viii) the parties

agreed to the payment of liquidated damages by the Debtor to VCI in the event of an untimely or failed delivery of the Retail Space.

Specifically, the second draft of the Contract, which Beloff delivered to Fraga, contained a $6 million liquidated damages clause (the "Damages Provision"). Shortly thereafter, the Debtor, through Fraga, responded with a third draft of the Contract containing a provision providing for the parties to employ an MAI appraiser to determine damages in the event that the Debtor failed to timely deliver a COC for the Retail Space. VCI rejected this proposal and advised the Debtor that a liquidated damages provision of $6 million for such a breach would be a material term of any proposed agreement. Although the parties exchanged additional drafts of the Contract during the next few weeks, and Abele discussed counter-offers with Fraga as to a liquidated damages amount in the $3.75 million to $4.5 million range, the $6 million liquidated damages figure was not altered. The parties executed the final version of the Contract, which contained the $6 million liquidated damages provision, on April 29, 2002.

Abele testified at trial that, notwithstanding the language of the Contract, he did not believe the liquidated damages provision would actually be employed. He instead believed the parties would assess damages through an appraisal or some similar process if there was a contractual default. Abele further testified that, at the time of Contract's execution, he believed VCI's damages in the event of a failed delivery of the Retail Space would be between $50,000 and $100,000. The Court does not find this testimony credible. First, the terms of the Contract itself, which Abele negotiated and executed, contradict the testimony. VCI rejected the Debtor's proposal to use the MAI appraisal process to liquidate damages and insisted upon the $6 million figure. Moreover, Abele is an experienced real estate developer, purports to be an expert on construction and real estate development, and has done consulting for others regarding real estate development. With such knowledge and experience, the record is clear that Abele, on behalf of the Debtor, negotiated and executed: (i) the Contract, dated April 29,

2002; (ii) the Amendment to the Contract[2], dated November 29, 2002; and (iii) the Option Agreement[3], executed at the closing of the Property on October 17, 2003. All of these agreements provided for liquidated damages of $6 million. There is no evidence that the Debtor objected to the liquidated damages provision as outrageous or unreasonable between the date of the Contract and the date of the bankruptcy petition (October 16, 2008).

In sum, the Court finds that the liquidated Damages Provision was the result of a knowing and arms length negotiation among the parties. The Court rejects the Debtor's allegations that the provision meant anything other than what it says or that the parties agreed it would not be enforced in the event of a default.

### B.    Debtor's Development Agreements with the City and CRA

Prior to the execution of the Contract, the Debtor commenced negotiations with the Mach family, the owners of a neighboring parcel of land (Lot 1 of Block 40) (the "Mach Lot"), in an effort to acquire that parcel and develop all of Block 40. Those negotiations were unsuccessful. Thereafter, the Debtor wrote to VCI, on or about November 15, 2002, advising that it intended to develop the Property without the Mach Lot.

After executing the Contract, but prior to closing on October 17, 2003, the Debtor also undertook investigations with the City of Hollywood (the "City") regarding the historic significance of the Hotel and met with various groups that might have objections to a development on the Hotel site. In November 2002, the Debtor submitted architectural preliminary designs and site plans (the "November 2002 Plans") to the City for a mixed-use development of approximately 21 stories and 238 condominium units with ground floor retail space of 25,000 square feet. Edwards, a former Executive Director of the CRA, testified that the Debtor could have proceeded with its November 2002 Plans without the Mach Lot. To that

---

[2] The Amendment to the Contract called for the Debtor to build 50 parking spaces for VCI at cost for the exclusive use of the Retail Space.
[3] The Option Agreement restated and replaced certain option-related terms of the Contract and Amendment to the Contract.

end, on or about March 23, 2003, the Debtor submitted an application for variances seeking the development of the November 2002 Plans without the Mach Lot.

However, the Debtor also entered into negotiations for certain incentives and tax increment financing ("TIF") from the City and the CRA Board of Directors. In June 2003, Edwards and the CRA staff recommended that the City and the CRA (i) negotiate a Development Agreement with the Debtor for all of Block 40, including the Mach Lot, to build an eighteen-story mixed-use development with ground floor retail space of 25,000 square feet, and, (ii) enter into a separate Development Agreement with the Debtor for the development and construction of another mixed-use development on Block 55. Edwards and the CRA staff also recommended (i) that the City use its eminent domain power in the event the Debtor was unsuccessful in buying the Mach Lot, (ii) that the City and the CRA pay certain sums of money on each of the two deals towards the land acquisitions, and (iii) that the CRA provide TIF of up to $11.5 million on Block 40 and up to $14.5 million on Block 55. After closing on the Property, the Debtor, the City, and the CRA entered into respective development agreements for Block 40 and Block 55. These agreements, which were executed and approved on the same date, provided significant financial incentives to the Debtor.[4]

As of the Petition date, the Mach Lot was still the subject of an appeal which was resolved in favor of the City (and the Debtor) in December 2008. *See City of Hollywood Cmty. Redevelopment Agency v. 1843, LLC*, 980 So.2d 1138 (Fla. 4th DCA 2008).

### III.  Valuation of Option

The Court heard extensive testimony at trial concerning the value of the Property and Option, as well as the damages that were reasonably foreseeable at the time the Contract was negotiated and executed.

---

[4] Abele testified that the Block 55 Development Agreement was mistakenly in the name of the Debtor and that he knew that the "real Block 55 developer" was some entity other than SFD. However, the CRA staff recommendation to the City and the CRA Board of Directors, dated June 8, 2003, was to negotiate the Development Agreement for Block 55 with the Debtor. The CRA and the City negotiated and executed the Development Agreement for Block 55 with the Debtor and also executed an Amendment to that Agreement with the Debtor.

Although he purchased the Property for $2.7 million, Abele testified that the Option was "additional consideration" for the purchase price. A July 23, 2002 offer from the Debtor to buy back the Option from VCI for $1 million, raising the effective purchase price of the Property from $2.7 million to $3.7 million, corroborates this testimony.[5]

At trial, the Court heard the testimony of Walter Duke, an MAI appraisal expert. Under an Income Approach Analysis, Duke testified that the Option had a value of zero, $2.09 million and $3.23 million as of April 29, 2002, October 17, 2003, and October 18, 2008, respectively. Duke derived these amounts from the potential profit the Option holder could expect based upon an analysis of comparable rents and costs to complete the construction, marketing and leasing of the Retail Space. Despite his acknowledgment that the Option had significant value, however, Duke concluded that VCI, as the Option holder, was only entitled to 10% of that value because "none of the work had really been done" on the Property. A prospective purchaser of the Option would therefore have to put in work and assume additional risks, entitling them to 90% of the Option's profit value.

While the Court notes that Duke ascribed significant value to the Option, it does not accept his attempt to discount 90% of the value, at least as held by VCI. First, neither Duke's report in evidence nor his testimony offers a rational basis for this assumption. Second, since Duke's analysis reflects the risk of the build-out as part of his computations, profit derived from the Option belongs to VCI, not to a hypothetical third-party purchaser. Finally, no agreement between the parties required VCI to sell the Option or precluded VCI from developing the Retail Space itself and keeping all of the profits.

The Court also heard the testimony of Richard Zimmer. During cross examination, Zimmer testified that the costs one would incur to rent out the Retail Space would be approximately $9.1 million. However, Zimmer made most of his estimates using the Means Cost Book and prior historical data from other projects as of other dates. Zimmer did not base

---

[5]Yosifove, on behalf of VCI, rejected that offer and insisted that the Property was worth substantially more, but counter-offered to sell the Property outright for $4.5 million.

his cost estimates upon the configuration of the actual structure and parking garage to be built on the Property, or the cost of construction from the quantities of materials that would be required. Zimmer also admitted that his analysis—utilizing the date of October 17, 2008, projecting back to either April 29, 2002 or October 17, 2003, and then projecting forward five (5) years—was unusual. In fact, he had never previously, in his 25 years of consulting as an expert, performed an estimate where he had to project back and then project forward in this fashion to come up with cost figures. For these reasons, the Court does not find Zimmer's testimony regarding cost figures credible.

Finally, the Debtor presented the testimony of James Fried. Fried offered an analysis of the Option based upon a "cash on cash" internal rate of return and opined that the Option never had significant value. Fried testified that he reached this opinion in part by utilizing a 50% loan-to-value ratio. However, Fried admitted that, as of the Contract date and the Option Agreement date, lenders were providing up to 75% loan-to-value loans and that many developers were obtaining mezzanine financing above that amount such that they had very little or no "cash in" deals. Fried further admitted that lenders were very aggressive in lending money from 2004 to 2006, and that if VCI had received the COC in November 2006 it would not have had to utilize a 50% loan-to-value ratio.

The Court struck Fried's expert report. Fried was never previously qualified as an expert, and while the Court allowed him to testify, his knowledge as a broker who was involved in real estate transactions of undeveloped property was insufficient to qualify him as an expert on shell retail space in mixed-use condominium developments. The only knowledge Fried has regarding the feasibility of mixed-use retail/condominium high rise development in the City of Hollywood is based upon the analysis and opinions of another developer for whom he was a consultant. Fried was neither involved in those feasibility studies nor privy to their analyses. His testimony is not applicable to the facts of this case and his findings regarding the market for

shell retail space lack credibility.

VCI presented its own testimony as to value. Yosifove, the principal of VCI, testified that he calculated the $6 million liquidated damage provision in 2002 in two different ways. First, he performed an income analysis taking into account the stabilized rents of $25/ft$^2$ to $30/ft$^2$ at $700,000 to $750,000 net operating income. Using a capitalization rate of 7.5% he arrived at a value of $10 million. After having to expend what he believed would be $4 million (as compared to the Debtor's original cost figures of $5 million), Yosifove calculated a potential $6 million profit for the Retail Space. Second, Yosifove agreed to negotiate down the original 30,000 square feet of retail space, but still justified using the $6 million figure since he felt that this alteration would have reduced some of the lesser quality space. Yosifove also calculated that if he was paying, pursuant to the Option Agreement, the prices of $65/ft$^2$ for hard costs, $5/ft$^2$ for soft costs and $40/ft$^2$ for turning the space from black box directly into vanilla shell, he would have total costs of $110/ft$^2$ as compared to the ability to sell the shell retail at $350/ft$^2$ for a total of $240/ft$^2$ profit, or $6 million.

VCI also presented the testimony of expert Michael Cannon. Cannon, a consultant to the City of Hollywood who attended the City commission and CRA meetings during the relevant time period, testified as to the reasonableness of the Damages Provision. According to Cannon, actual damages were not identifiable on the date of Contract formation or the date of closing due to numerous variables such as (i) when the Property would be constructed and the COC would be issued; (ii) when the leases would start and for how much; and, (iii) what the costs would be of the build-out and the time necessary to market the Retail Space. Retrospectively, Cannon testified that the Option had a value of $4.5 million as of April 30, 2002, and a value of $5 million as of October 17, 2003. He further opined that VCI's actual damages as of October 17, 2008 were $4.25 million. Cannon concluded that the $6 million figure for liquidated damages was fair and reasonable based on his valuation of the Option.

Finally, Cannon testified that nothing precluded the Debtor from developing the Property without the Mach Lot because the Debtor had certain zoning entitlements and development rights, but that the Debtor wanted the TIF incentives for both Block 40 and Block 55.

In sum, the Court heard testimony from a number of witnesses whom ascribed a value to the Option ranging from zero to the full $6 million liquidated damages figure in the Contract. The Court, while not necessarily required to itself fix a precise value on the Option, cannot accept the Debtor's claim that the Option has zero value when the parties themselves were negotiating a buy-back of the Option for at least $1 million in 2002, and the Debtor's own expert (Duke) ascribed a value of in excess of $3 million to it as of October 18, 2008. By the same token, the Court finds credible the testimony of Yosifove and Cannon that, at least as of the time the Contract was being negotiated and executed, the $6 million liquidated damages figure was a reasonable estimate.

### IV.    Enforceability of Liquidated Damages Provision

The Objection and Amended Objection argue that the liquidated damages provision contained in the Contract is not enforceable.

"It is well settled that in Florida the parties to a contract may stipulate in advance to an amount to be paid or retained as liquidated damages in the event of a breach." *Lefemine v. Baron*, 573 So.2d 326, 328 (Fla. 1991) (citing *Poinsettia Dairy Products. v. Wessel Co.*, 166 So. 306 (Fla. 1936); *Southern Menhaden Co. v. How*, 70 So. 1000 (Fla. 1916)). The purpose of this rule is to protect the expectation interests of contracting parties while prohibiting the imposition of punitive damages. *See MCA Television, Ltd. v. Pub. Interest Corp.*, 171 F.3d 1265, 1271 (11th Cir. 1999). Under Florida law, a stipulated damages provision will be enforced when (i) the damages consequent upon a breach are not readily ascertainable, and (ii) the stipulated sum is not so disproportionate to reasonably anticipated damages so as to demonstrate that the parties intended to induce full performance instead of liquidating the

damages. *Lefemine v. Baron*, 573 So.2d at 328.

### A.     Damages Not Readily Ascertainable

The Supreme Court of Florida has held that liquidated damages provisions are appropriate and enforceable in land sale contracts. "Because the 'land sale market in Florida fluctuates from year to year and season to season,' Florida recognizes that 'it is generally impossible' to say at the time a contract is executed what the seller's loss will be if the buyer fails to close." *Hot Developers, Inc. v. Willow Lake Estates, Inc.*, 950 So.2d 537, 540 (Fla. 4th DCA 2007) (quoting *Hutchinson v. Tompkins*, 259 So.2d 129, 132 (Fla. 1972)).[6] Additionally, the further into the future the parties attempt to predict their damages, generally speaking, the less likely that they will be able to achieve any level of accuracy.

The parties in this case were attempting to determine what the damages arising from a breach would be five (5) years into the future under a real estate option contract. While the parties could estimate the value of the Retail Space upon its completion and transfer to VCI, this value, as with all real estate transactions, remained subject to the whims and uncertainties of the real estate market. It is beyond question that the amount of damages was not readily ascertainable in this case. The first prong of the *Lefemine* analysis is satisfied.

### B.     Sum Not so Disproportionate so as to Demonstrate that the Parties Intended to Induce Full Performance

The second prong of the *Lefemine* test asks whether the stipulated sum is so disproportionate in relation to reasonably anticipated damages so as to demonstrate that the parties intended it to induce full performance. *Lefemine v. Baron*, 573 So.2d at 328. A stipulated damages amount "is reasonable to the extent that it approximates the loss anticipated at the time of the making of the contract, even though it may not approximate the

---

[6] "The supreme court's characterization of the Florida real estate market in *Hutchinson v. Tompkins*, 259 So.2d 129, 132 (Fla. 1972), recalls J. Pierpont Morgan's prediction about the stock market. 'When asked by a brash young investor for a forecast about how the market would go, Morgan glared down his generously endowed nose, bristled his mustache, and replied: "It will fluctuate, young man. It will fluctuate."' *Time Magazine*, Fri. Aug. 19, 1966, located at http://www.time.com/time/magazine/article/0,9171,836266,00.html." 950 So.2d at 540 n.1.

actual loss." Restatement Second of Contracts § 356, Comment b (2009). Moreover, "[t]he greater the difficulty either of proving that loss occurred or of establishing its amount with the requisite certainty, the easier it is to show that the amount fixed is reasonable." *Id.*

Again, the Court finds the testimony of Yosifove and Cannon credible in that, at the time the Contract was being negotiated and executed, the estimate of damages in the range of $6 million upon a breach of the Option was reasonable. This, coupled with the latitude permitted in the approximation of harm where it is difficult to liquidate damages with certainty, leads the Court to find that the $6 million figure is not so disproportionate to damages that might reasonably have been expected to follow from a breach of the Contract so as to demonstrate that the parties intended it to induce full performance. The second prong of the *Lefemine* test is satisfied.

### C. The Option Does Not Provide a Non-Exclusive Remedy

The Debtor also asserts that the liquidated damages provision is unenforceable because it provides a non-exclusive remedy to VCI in the event of a breach. *MCA Television, Ltd*, 171 F.3d at 1272 ("Florida courts have consistently recognized as a penalty a stipulated damages provision that allows the non-breaching party a choice of options in the event of a breach."); *see also Lefemine*, 573 So.2d at 328-29 (rejecting as unenforceable a lease provision that provided the landlord with the option to either retain the security deposit or to sue for actual damages upon a tenant breach). The reason for this rule is that the existence of a non-exclusive remedy is inconsistent with the intention of contracting parties to liquidate or 'fix' their damages in the event of a breach. *See Lefemine*, 573 So.2d at 328-29.

The Damages Provision does not provide VCI with a choice of options in the event of a breach by SFD. It instead states that the $6 million dollar figure represents consideration "for all of [VCI's] right, title, and interest under the Option," and that upon payment of the stipulated amount, the "Agreement and Option granted hereunder shall terminate and shall be

automatically rendered null and void and of no further force and effect." In other words, once the Debtor pays $6 million in liquidated damages to VCI, VCI cannot seek any other remedies under the Contract. These terms differ from the penalty provision in *Lefemine*, which provided that a lessor could either retain a security deposit in full settlement of any claims upon a breach by the lessee, or, "at his option...proceed at law or in equity to enforce his rights under the Contract." 573 So.2d at 327-28. That provision provided the lessor with a range of options in the event of a breach if his actual damages exceeded the liquidated damages; accordingly, it destroyed "the character of the forfeiture as agreed damages and the forfeiture [became] a penalty." *Lefemine*, 573 So.2d at 38-29. In contrast, the Damages Provision affords VCI one option in the event of a breach: to submit a written demand to the Debtor for $6 million. The holding of *Lefemine* therefore does not apply in this regard.

## V. Liquidated Damages Amount is Not Unconscionable

Even if a contract provision is determined to be a liquidated damages provision and not a penalty, a court of equity will not enforce the provision if it would be unconscionable to do so in light of circumstances existing at the time of breach. *Hyman v. Cohen*, 73 So.2d 393, 401 (Fla. 1954). In determining whether enforcement of a liquidated damages provision would be unconscionable, factors to be considered include (i) whether the breach occurred as a result of circumstances beyond the control of the breaching party, and (ii) whether the size of the benefit to be received by the non-breaching party would be sufficiently large as to shock the conscience of the court. *See Hot Developers, Inc.*, 950 So.2d at 541-42.

The Court does not find the $6 million liquidated damages provision to be unconscionable in light of the above factors. The Debtor attributes its breach, at least in part, to the City's requirement that the Mach Lot be included in the development of the Property. The Edwards testimony revealed, however, that the Debtor could have proceeded with the November 2002 Plans, which did not include the Mach Lot, before entering into negotiations for

incentives and TIF from the City and CRA Board of Directors. These negotiations produced the June 2003 recommendation from Edwards and the CRA staff that the development of the Property include the Mach Lot. Simply put, the Debtor is in a bind of its own making. In light of the cumulative facts and circumstances of this case, the $6 million figure does not shock the conscience of the Court. The Damages Provision is not unconscionable.

## VI.   Affirmative Defenses

The Debtor additionally argues that it was excused from performing under the Option Agreement based on the affirmative defenses of impossibility, frustration of purpose, waiver and estoppel.

### A.   Impossibility and Frustration of Purpose

The Debtor alleges that the doctrine of impossibility excuses it from performance because, through no fault of its own, the Debtor never acquired title to the Mach Lot, which the City required for the development of the Property.

Under Florida law, impossibility of performance is employed with caution; if knowledge of the facts that made performance impossible was available or foreseeable to the promissor, the promissor cannot then invoke those facts as a defense to nonperformance. *See, e.g., Stein v. Paradigm Mirsol, LLC*, 551 F. Supp. 2d 1323, 1330 (M.D. Fla. 2008); *Am. Aviation, Inc. v. Aero-Flight Serv., Inc.*, 712 So.2d 809, 810 (Fla. 4th DCA 1998).

As stated, the Debtor could have proceeded with its November 2002 Plans, which did not include the Mach Lot, before entering into negotiations for incentives and TIF from the City and CRA Board of Directors. The CRA staff recommendations to the City and the CRA Board of Directors included the recommendation that the City use its eminent domain power in the event the Debtor was unsuccessful in buying the Mach Lot. Moreover, Abele testified that prior to closing with VCI, the Debtor met with a reputable eminent domain attorney from Brigham Moore, LLP and was advised that issues relating to eminent domain could result in a protracted

appeal. Thus, the circumstances that the Debtor now alleges excused its timely performance were wholly foreseeable, if not known, to the Debtor at the time that it executed the Option Agreement with VCI.

Irrespective of the above, the Debtor had VCI terminate the leases on the Hotel site for the ground floor retail space so that the Debtor could commence construction in 2005. This suggests the Debtor anticipated obtaining its approvals for the development of Block 40 in one (1) year or less so as deliver the COC for the Retail Space to VCI sometime in late 2006. The Option Agreement provided that the Debtor had five (5) years from the Effective Date (or until October 18, 2008) to deliver the COC for the Retail Space. Rather than negotiating a provision for the anticipated delay involving the Mach Lot, the Debtor took the business risk that within five (5) years, the Mach Lot issue would be resolved and the Debtor would be able to obtain building permits and commence construction on Block 40.

"As a general rule, a contract is not invalid, nor is the obligor discharged from its binding effect, because the contract turns out to be difficult or burdensome to perform." *Home Design Center-Joint Venture v. County Appliances of Naples, Inc.*, 563 So.2d 767, 769–70 (Fla. 2d DCA 1990). As the Eleventh Circuit has recognized in applying Florida law, "it is not the function of the courts to 'rewrite a contract or interfere with the freedom of contract or substitute their judgment for that of the parties thereto in order to relieve one of the parties from the apparent hardship of an improvident bargain.'" *Marriott Corp. v. Dasta Constr. Co.*, 26 F.3d 1057, 1068 (11th Cir. 1994) (quoting *Steiner v. Physicians Protective Trust Fund*, 388 So.2d 1064, 1066 (Fla. 3d DCA 1980)). In this case, there was no unforeseen circumstance excusing the Debtor's timely performance and the Debtor cannot now be relieved of what it finds to be a burdensome obligation under the Option Agreement.

**B.     Waiver**

The Debtor alleges that VCI waived the requirement that the COC for the Retail Space be made available within five (5) years of closing. In particular, the Debtor contends that VCI took affirmative steps to resolve the eminent domain litigation over the Mach Lot after it knew that the Debtor would not deliver the COC by October 17, 2008.

In order for a waiver to exist, an individual must possess a right, have knowledge of said right, and act in a way that is 'inconsistent with the right or his intention to rely upon the right.'" *Woods v. Christensen Shipyards, Ltd.*, 2005 U.S. Dist. LEXIS 42994, *7 (S.D. Fla. Sept. 23, 2005) (quoting *Weisbart & Co. v. First Nat'l Bank*, 568 F.2d 391, 396 (5th Cir. 1978)). Moreover, "to constitute a waiver, other than by express agreement, there must be unequivocal acts or conduct evincing an intent to waive. Intent cannot be inferred from doubtful and ambiguous factors." *Woods v. Christensen Shipyards, Ltd.*, 2005 U.S. Dist. LEXIS 42994 at *7 (quotation omitted). "Finally, waiver does not exist when one waits a reasonable time to attempt to enforce a right." *Id.* at *7–8.

In this case, the Option Agreement clearly states, "In the event that [SFD] does not obtain [a COC] for the [Retail Space] and deliver written notice thereof...on or before the expiration of five (5) years following [October 17, 2003], then and in that event, [SFD] shall be liable..." No affirmative action or notice by VCI was necessary to trigger a breach in the event that the Debtor failed to timely deliver the COC for the Retail Space. It is therefore difficult to believe that there was a waiver of timely performance in this case.

The Court having made the above findings of fact and conclusions of law, it is

**ORDERED** as follows:

1. The parties negotiated at arms length and in good faith over the $6 million liquidated damages clause and the Court will not substitute its judgment after the fact for theirs;

2. Actual damages were not readily ascertainable as of the dates the parties

executed the Contract and Option Agreement;

3. The $6 million liquidated damages provision of the Option Agreement is not a penalty and is enforceable;

4. The $6 million liquidated damages provision of the Option Agreement is not unconscionable;

5. The Debtor is not excused from performance based upon impossibility of performance or frustration of purpose, since the Debtor was well aware of the involved risks prior to Contract formation and closing. The Debtor assumed the business risks associated with the development of the Property;

6. The Debtor is not excused from performance based upon waiver, since the Option Agreement does not require an affirmative action or notice by VCI to trigger a breach in the event that the Debtor failed to timely deliver the COC for the Retail Space;

7. The Objection [DE 73] and Amended Objection [DE 106] are overruled.

8. VCI is granted and deemed to hold an allowed unsecured claim against the Debtor's estate in the amount of $6 million.

###

Copies furnished to:

Arthur Halsey Rice, Esq.

*Attorney Rice is directed to serve a conformed copy of this order upon all interested parties and to file a certificate of service in accordance therewith.*